### BUTLER v. GLENS FALLS, S. H. & FT. E. ST. R. CO.

*(Supreme Court, General Term, Third Department. July 2, 1888.)*

TRIAL—VERDICT—SUFFICIENCY OF EVIDENCE.
> In an action against a street-car company for injuries sustained in attempting to
> board one of defendant's cars, plaintiff's testimony tended to show that, as the car
> approached with the horses in a trot, he signaled twice to stop; that, when near to
> him, they had slowed up to a walk, and as he placed his foot on the step, by direc-
> tion of the conductor, the horses were suddenly started, causing a jerk, thereby
> throwing plaintiff to the ground, injuring his foot. Defendant's testimony was di-
> rectly contradictory; the conductor saying that he warned plaintiff against attempt-
> ing to board the car at that place. The questions of defendant's negligence and
> plaintiff's contributory negligence were referred to the jury under proper instruc-
> tions, and they found for plaintiff. *Held*, that the verdict will not be set aside as
> against the weight of the evidence.[1]

Action by William J. Butler against the Glens Falls, Sandy Hill & Fort
Edward Street Railroad Company, for injuries sustained in attempting to
board defendant company's street car. Judgment for plaintiff. Defendant
appeals.

Argued before LEARNED, P. J., and LANDON and INGALLS, JJ.

*M. A. Sheldon,* for appellant. *A. V. Pratt,* for respondent.

INGALLS, J. The trial of this action developed a fair question of fact which
involved the merits of the controversy, and the evidence shows a sharp con-
flict in regard to the material features of the case. And the evidence does not
preponderate so decidedly in favor of the defendant as to call for a reversal
of the judgment upon that ground. The testimony of the plaintiff is to the
effect that, as the car approached him, he made two signals indicating his de-
sire to enter the car as a passenger, he being at the time in full view of the
conductor, and of the other person who he states was driving at the time, and
could have been seen if either had been attentive; that, after the second sig-
nal, the horses commenced to slacken their gait from a trot, and, as they ap-
proached the crossing where the plaintiff was standing, came to a very slow
walk, and nearly stopped; that he attempted to enter the car by seizing the
rail; and, placing one foot upon the step, and while in the act of raising the
other foot, the conductor called out to the boy who held the lines, "Don't stop
there!" when the horses were suddenly urged forward by a slap of the lines,
which caused a sudden jerk, which had the effect to throw the plaintiff from
the car to the ground, and caused the injury to his foot of which he complains.
Maren S. Richards, who was a passenger upon the car, testified: "Was riding
on this car at the time and place of the accident. I should think the horses
were traveling on a walk. I have no doubt about it. Naturally, it would be
a slow walk. I could not tell whether the horses had been trotting just pre-
vious to that or not. I was busy talking to another man. At this crossing
I felt a jar. I spoke to Mr. Bardin, 'I think we have struck a stone.' The
horses were under slow motion at that time. Immediately after that they
stopped." Gardner Cutting, another witness, testified: "I noticed Mr. But-
ler before the car came along. He stopped a moment or two at the corner of
the church. Then he crossed the walk. I should judge he went about there,

---

[1] As to the province of the court and the jury in determining questions of negligence,
see Muhr v. City of New York, *ante,* 59, and note.

but past the tracks. He stood there, and waved his hand, as a signal to the car, once that I know of. He had a cane in his hand. When he signaled in that way with his hand and cane, the horses were about one hundred feet from him. They were trotting six miles an hour. When he signaled, the horses kind of slowed up; and, up to the time the horses were crossing this crossing, they were walking,—an ordinary walk." It seems, from the evidence, that Donnelly generally discharged the duties of conductor and driver upon the cars; but, according to the evidence of the plaintiff, a boy was driving at the time of the casualty, and Donnelly stood near him.

John Donnelly, the conductor, was examined as a witness, and in several material particulars testified in direct conflict with the version of the transaction given by the plaintiff, and the other witnesses who were produced by him upon the trial. Donnelly testified as follows: "John Donnelly, sworn for defendant, testified: I reside between Sandy Hill and Glens Falls. On Thanksgiving day last my business was street-car driver and conductor. I saw plaintiff on Thanksgiving day last. I think the car I was driving on that day was No. 5, S. D. Kendrick; I am not positive. I was present at this accident. In the car there were seven or eight passengers, and two or three gentlemen on the rear platform, and one man on the front platform with me. Besides that, on front platform, I had two five-gallon oyster kegs, that set on the left of me; and on top of those kegs a large package that a young man named Brewer, a clerk in Wurtenberg's store, had put on for me to take to Glens Falls; and, in addition to that, this young man had a roll of oil-cloth one and one-half or two yards wide. He stood on the left-hand side of this package, with his arm around the oil-cloth. That, I think, was all I had on the car at the time. As I came to this cross-walk at the south of the Methodist Church, there is a little incline there, bearing north. The team, at that point, would voluntarily start on a trot. They had been so trained to get headway to ascend to the bridge. About the time they started on a trot, I saw a man standing on the upper cross-walk. I spoke to the boy Brewer. The man at that time was standing. He had come from the west sidewalk, and was standing facing nearly north-east, so that he was not looking towards the car, when I first observed him. When the horses started on a trot, this man turned around, and looked towards the car. He had a cane in his hand, and changed hands with that cane, and placed it in his pocket or by his side, the end sticking up. He crossed the track. The team was going on a trot. I was whipping the gray horse, that is lazy, with a whip. As he crossed the track, I should think he was from six to ten feet from the horses. I was going a pretty rapid gait, and he turned then to make for the car. That was the first intimation I had of the man wanting to get on; and, as he started across, I didn't know but he was going to continue on, and I was six to ten feet from him. He turned then, and made for the car. I had the lines in my left hand, and whip in the right hand, and I motioned to him with the whip, and said: 'Hold on; don't try to get on here; I will wait for you on the bridge;' and by that time the man had caught hold of the car, and I saw he had fell, and I applied the brake, and got off to see if he was hurt, and in my haste I didn't set the dog that holds the brake, and consequently the car started down the grade, and I jumped on again, and applied the brake, and set the dog. *Question.* Who had hold of the lines at that time? *Answer.* I think the young man Brewer had hold of the lines. I got off, and helped carry the man into Clancey's bakery, and somebody said, 'Go and get the doctor.' The man was apparently hurt. And I spoke several times about getting the doctor, and somebody said the doctor was coming; and I saw I could do no good there, and continued on my journey. The ladies didn't get back on the car. *Q.* Where was Butler when you saw the first indication to you that he wanted to get on the car? (Objection made, but overruled.) *A.* He was on the east side of the track. *Q.* How near to the track as he stood there? *A.* I should

say three feet from it.   Q. At that time, where was the car with reference to that walk?   A. The car at that time was probably the horses' length from the walk.   He crossed just ahead of my horses.   He started when six to ten feet of him, and the speed I was going I got nearly to him before he crossed the track.   Q. After you discovered the first indication that Butler intended to enter that car, what did you do, if anything, towards slowing up that car?   A. I didn't slow up at all; I didn't slacken my speed.   I merely waved my whip at him, and told him not to get on there; that I would wait for him on the bridge.   Q. Where, with reference to those two walks, did the horses first commence to trot?   A. I think as soon as they struck the walk below the church, along by Hodgman's.   That cross-walk was about the place the horses commenced to trot.   They usually start voluntarily there.   Q. Was there any slowing up, to your knowledge, of the speed of those horses at any place between those two walks?   A. No, sir.   Q. Was there until after the plaintiff was struck?   A. No, sir.   Q. Those horses of different colors?   A. Yes, sir.   Q. One of them gray?   A. The middle one was gray, and I think the nigh one black, and the off one roan or chestnut.   Q. The gray was a large horse?   A. Yes, sir.   Q. And, instead of slowing up, what did you do, if anything, to increase your speed?   A. I continued to slap them with the whip.   Q. Did you at any time strike or slap the horses with your lines?   A. Not that I remember; I used my whip.   In ascending the hill, I usually have my lines taut, if anything happens.   We have a double thill on, and the horses can generally stop a car without applying any brake.   Q. Will you describe the way in which those horses were hitched onto that car, and how much space they occupied across the street?   A. They were hitched on what is known as a 3-horse evener, connected with a heavy pair of shafts.   The center horse is between those shafts, and the horse on each side outside of them, with the 3-horse evener attached to the shafts.   On the left-hand side is a pair of whiffletrees, and on the right hand of it is a single whiffletree attached to the evener.   Q. Are those whiffletrees as long as the car is wide?   A. I think full as long, or longer.   Q. And the three horses occupied as much space in the road as the car, or more?   A. Yes, sir.   Q. In what direction was Butler moving when you first saw him attempt to get on the car?   A. He was moving in a southerly direction.   He had crossed the track, and faced south, and made a lunge to grab the car.   The moment I saw him turn to come towards the car I motioned to him with the whip, and sung out: 'Don't try to get on here; I will wait for you on the bridge.'   About the time that was uttered, he grabbed hold of the car, and the car pulled him right over.   The man never got his foot on the platform at all, or the step.   Q. How was you standing?   A. A little to the left, behind my brake.   Q. Either of your feet on the step?   A. No, sir; neither of them."   Frederick A. Brewer, who, according to the plaintiff's evidence, was driving the horse when the accident occurred, was examined as a witness, and in the main sustained Donnelly's statement. Other witnesses were produced upon the trial by the respective parties; and the case presents the conflict in the evidence usual in cases of this nature.

Upon the facts as stated by the plaintiff, and the witnesses who support his theory, it would seem that the act of the servant in charge of the team and car, in starting the team suddenly, just as the plaintiff was in the act of entering the car, and thereby causing the sudden jerk which threw him to the ground, was a negligent act, and wholly unjustifiable.   *Eppendorf* v. *Railroad Co.*, 69 N. Y. 195; *Roberts* v. *Johnson*, 58 N. Y. 613; *Maher* v. *Railroad Co.*, 67 N. Y. 52; *Hayes* v. *Railroad Co.*, 14 Wkly. Dig. 28; *McGlynn* v. *Railroad Co.*, 6 N. Y. St. Rep. 51.   The evidence of Donnelly indicates that he saw plaintiff when in the act of entering the car, but states that he warned him against the attempt at that place.   Whether any such warning was given, was one of the questions at the trial, which was involved in the conflict in the evidence, and therefore it became the province of the jury to

settle such question, which they did by their verdict. Assuming that the jury were justified by the evidence in accepting the plaintiff's theory in regard to the transaction, we fail to discover wherein the plaintiff was chargeable with any negligence which contributed to the injury of which he complains, within the principle settled by the adjudications referred to. It seems to us that the case was one eminently proper for the consideration and determination of the jury upon the questions as to whether negligence was attributable to the defendant's servants, and also whether the plaintiff was chargeable with contributory negligence. In regard to the rules and regulations which, as claimed by the defendant, were in the car, we fail to perceive wherein the plaintiff was shown to have violated the same, assuming, as we think we must, that the plaintiff's evidence is reliable, and that the jury credited it. It is not probable that the plaintiff saw such rules upon the occasion in question. It does not seem reasonable to assume, as matter of law, that a person who, in an orderly way, attempts to enter a street car as a passenger, is to be regarded as a trespasser until a special contract has been made with the conductor, based upon the payment of the required fare. Where the passenger refuses to pay the fare upon request, he may be ejected in a proper manner, as well as for improper conduct, by which he forfeits his right to remain in the car. We have examined the charge of the judge at the trial, and the rulings made during its progress, and discover no error which calls for a reversal of the judgment; and the same must be affirmed, with costs.

LEARNED, P. J., and LANDON, J., concur.